

**IT IS ORDERED as set forth below:**

**Date: July 20, 2017**

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 15-61378-WLH |
| | ) | |
| SHEHNAZ ALI VIRANI, | ) | CHAPTER 7 |
| a/k/a Shehnaz Alivirani, | ) | |
| | ) | JUDGE WENDY L. HAGENAU |
| Debtor. | ) | |
| | ) | |
| GIRISH MODI, | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | ADV. NO. 15-5331 |
| | ) | |
| SHEHNAZ ALI VIRANI, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEBTOR A DISCHARGE**

This matter came before the Court for trial on an Objection to Discharge under 11 U.S.C.

§§ 727(a)(2), (a)(3), (a)(4), (a)(5) and (a)(6). Plaintiff proceeded *pro se*. The Debtor was

represented by Evan Altman. The Court has jurisdiction over this matter pursuant to 28 U.S.C.

§ 1334 and 28 U.S.C. § 157.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## FINDINGS OF FACT

The Debtor Shehnaz Ali Virani is married to Ramzan Ali Virani.  The Viranis have two children, a boy and a girl, ages twenty and nineteen respectively at the time the petition was filed.  Over the last ten or more years, the Viranis have been involved in various businesses.  In March 2012, they incorporated S.H. Mart, Inc. ("SHM") which operated an events facility. Plaintiff Girish Modi ("Mr. Modi" or "Plaintiff") made two loans to Mr. and Mrs. Virani totaling $50,000.00.  The Viranis did not pay the sums due under the notes, and Mr. Modi commenced a lawsuit in 2013 in Gwinnett Superior Court. The parties ultimately participated in mediation and signed a mediation agreement on August 28, 2014. This mediation agreement was incorporated into an order of the Gwinnett Superior Court dated January 8, 2015. Both the agreement and the order required the Viranis to make payments of $300.00 per month to Mr. Modi. If any monthly payment was not made by the 6th of the month, the order and agreement provided that the Viranis would be in default and Mr. Modi could obtain a judgment for the total amount of $65,000.00 (minus any amounts paid) as well as a *fi fa*.

The Viranis made payments under the agreement and order, but the April 2015 payment was received by Mr. Modi one day late. Mr. Modi filed an affidavit to obtain a *fi fa* on April 8, 2015, to which the Viranis responded. The Gwinnett Superior Court ruled in favor of Mr. Modi and issued the *fi fa*. Mr. Modi sent an e-mail on June 17, 2015 to the Viranis' counsel (copying Mr. and Mrs. Virani) stating in part that he would "send Sheriff to confiscate your personal property including cars" if the parties could not reach a resolution.

Mr. Virani filed a petition under Chapter 13 of the United States Bankruptcy Code at Case No. 15-61364 on June 19, 2015 at 2:51 p.m.  Mr. Virani was represented in the filing of his

case by Evan Altman.  Mrs. Virani (the "Debtor") filed her petition under Chapter 7 of the United States Bankruptcy Code on the same day at 4:15 p.m.  The original petition showed her name as "Shehnaz Alivirani".  The original petition indicated that her debts were primarily consumer in nature.  In answer to the question of whether the Debtor had filed previous bankruptcy petitions, she answered "no".  The question of whether her spouse had a pending bankruptcy case was also answered "no".  The petition was signed as a *pro se* debtor.

Mr. Modi immediately filed motions to dismiss in both cases.  After the original motions to dismiss were filed, Evan Altman appeared as counsel for the Debtor.  Mr. Altman filed the Debtor's Schedules and Statement of Financial Affairs ("SOFA") on July 20, 2015 [Docket No. 18].  The Debtor amended her petition to correct her name and to disclose a prior bankruptcy case on July 24, 2015 and July 27, 2015 respectively [Docket Nos. 23 and 24].  She also amended her Schedules on August 12, 2015 [Docket No. 29] and February 26, 2016 [Docket Nos. 132 and 133] and then again on February 7, 2017 [Docket No. 192].  Mr. Virani voluntarily dismissed his Chapter 13 case on September 13, 2015.  Mr. Modi's Motion to Dismiss, therefore, proceeded only as to the Debtor.

On September 21, 2015, the Court held an evidentiary hearing on the Motion to Dismiss ("September 2015 Hearing").  The Court subsequently entered an order on October 15, 2015 [Docket No. 53] denying the Motion to Dismiss ("Section 707 Order").  The Court ruled that the Motion to Dismiss under 11 U.S.C. § 707(b) was improper because the debts of Mrs. Virani were not primarily consumer debts and Section 707(b) only applied to such a debtor.  The Court also held that, even if the debts were primarily consumer debts, Mrs. Virani was a below median income debtor and only the judge or United States Trustee could bring such motion.  The Court then analyzed the Motion to Dismiss under 11 U.S.C. § 707(a) and found that cause for dismissal had not been shown.

In the meantime, Mr. Modi filed a complaint against the Debtor on August 21, 2015 in the above-styled case, alleging her discharge should be barred under 11 U.S.C. § 727 and her debt to him should be deemed non-dischargeable under 11 U.S.C. § 523.  The complaint was amended on October 22, 2015, October 26, 2015, November 12, 2015, and July 14, 2016.  After several conferences and motions, the Court decided to proceed in this trial only on the Section 727 portions of the complaint, reserving a trial on the Section 523 allegations if necessary until after a determination of whether the Debtor was entitled to a discharge at all.  At the trial, Plaintiff alleged (1) the Debtor made numerous false statements in her Schedules, SOFA and at trial; (2) concealed her interest in certain vehicles; (3) failed to maintain adequate records at SHM; (4) failed to satisfactorily explain the loss of assets; and (5) failed to comply with certain discovery orders.

Additional Findings of Fact are made below in connection with each of Plaintiff's allegations and are incorporated herein as additional Findings of Fact.

## LEGAL CONCLUSIONS

Plaintiff contends the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), (a)(5) and (a)(6).  Because one of the fundamental goals of the Bankruptcy Code is to provide a debtor with a fresh start, "[a] denial of a discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party."  Eastern Diversified Distribs., Inc. v. Matus (In re Matus), 303 B.R. 660, 671 (Bankr. N.D. Ga. 2004) (cites omitted). "[T]he reasons for denying a discharge … must be real and substantial, not merely technical and conjectural."  Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994) (cites omitted).  The burden of proving the objection to discharge is generally on Plaintiff, Fed. R. Bankr. P. 4005, and the burden must be carried by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279 (1991).

# I.    False Oaths – 11 U.S.C. § 727(a)(4)

To deny a debtor a discharge under Section 727(a)(4)(A), a plaintiff must show "… the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account; …". 11 U.S.C. § 727(a)(4)(A).  Under this section, a plaintiff must show there was a false oath, that it was material, and that it was made knowingly and fraudulently.   A misrepresentation is material "if it bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) (cites omitted).  Detriment to creditors need not be shown.  Id.  Furthermore, the debtor may not defend himself by claiming the assets omitted were worthless.  Id.  "Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them."  Id.  While the definition of materiality is broad, it is not without limits as the purpose of the requirement the debtor make disclosures is to allow the trustee or creditors to investigate the debtor's affairs and recover any assets without "costly investigations".  Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999).  So if the omission would not assist or impede the debtor or creditors in this endeavor, it is not material.  Id.; see also Cadle Co. v. Pratt (In re Pratt), 411 F.3d 561, 568 (5th Cir. 2005) (failure of debtor to list his position as trustee of trust for his children was not material because the knowledge would not assist the debtor's creditors); Spencer v. Blanchard (In re Blanchard), 201 B.R. 108, 130 (Bankr. E.D. Pa. 1996) (undervaluing assets that would have been exempt was not material); Manning v. Watkins (In re Watkins), 474 B.R. 625, 654-55 (Bankr. N.D. Ind. 2012), aff'd sub nom.; Manning v. Watkins, 2013 WL 3989412 (N.D. Ind. July 31, 2013) (failure to disclose interest in corporations not material to administration of the estate); Ivory v. Barbe (In re Barbe), 466 B.R. 737, 748 (Bankr. W.D. Pa. 2012) (failure to disclose dismantled stage immaterial because had no value).

Finally, a plaintiff must show that the omission or misstatement was made knowingly and with intent to deceive.  A plaintiff must demonstrate actual common, not constructive, fraud, Wines v. Wines (In re Wines), 997 F.2d 852, 856 (11th Cir. 1993), but actual intent may be inferred from circumstantial evidence.  Ingersoll v. Kriseman (In re Ingersoll), 124 B.R. 116, 122-23 (M.D. Fla. 1991).  Furthermore, "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727."  Cadle Co. v. Taras (In re Taras), 2005 WL 6487202, at *4 (Bankr. N.D. Ga. Aug. 19, 2005) (cite omitted). A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of intent to deceive.  Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992).  The discharge may not be denied, however, when the untruth was the result of a mistake or inadvertence.  Id.  Further, while the omission of worthless assets may be material, the value of the asset omitted may be evidence of the debtor's intent, or lack thereof, to deceive. See Garcia v. Coombs (In re Coombs), 193 B.R. 557, 565-66 (Bankr. S.D. Cal. 1996).

Plaintiff contends the Debtor made numerous false oaths in her Schedules and in her testimony, including the following:

    (a)  the ownership, operation of and payment for certain vehicles,

    (b)  the existence of the Debtor's prior bankruptcy filing,

    (c)  the existence of the Debtor's husband's pending bankruptcy case,

    (d)  the Debtor's 2013 income,

    (e)  all payments made within 90 days,

    (f)  payments to the Debtor's attorney,

    (g)  the Debtor's position and ownership in SHM,

    (h)  the Debtor's relationship with Mills and Hoopes,

    (i)  Debtor's husband's income,

(j)   Schedules I and J,

(k)   the Debtor's 2014 tax refund,

(l)   the Debtor's 2015 tax refund, and

(m)  the nature of the Debtor's debts as primarily consumer or business debt.

The Court will explore each of Plaintiff's allegations.  The Court will first examine the falsity

and materiality of each of the alleged false oaths, followed by a determination of the Debtor's

intent.

### A.   <u>Cars</u>

Much of the testimony at the trial focused on the Debtor's disclosure or lack thereof

about the cars driven by the Debtor's family.  The Debtor and her husband consistently testified

that the family had three cars at the time the petition was filed.  All three were purchased within

four months of the bankruptcy filing.  The loans for all three cars were in the names of the

Debtor's children, which the Debtor and her husband stated was because the children's credit

was better.  The initial car loans were made by Platinum Federal Credit Union ("PFCU").  The

PFCU representative confirmed the children's credit was better than the Debtor's.  She explained

the credit union had special programs for young people for which one or both of the Debtor's

children qualified.  Plaintiff alleges, however, the Debtor's testimony that the car loans were put

in the names of her children because she could not get credit was false.  Plaintiff points out that

the Debtor obtained a $12,000.00 personal loan from PFCU on March 31, 2015, in the same time

period when the car loans were obtained.  Clearly, he argues, the Debtor did not have poor

enough credit to keep her from obtaining a $12,000.00 unsecured personal loan.  But the PFCU

representative testified the Debtor's loan was guaranteed by two unrelated guarantors, which

suggests the Debtor's credit alone was not sufficient to support the loan.  Moreover, the fact the

Debtor borrowed $12,000.00 does not mean that after obtaining that loan she could have

obtained additional credit or that such additional credit would have been on as favorable terms as what her children were able to obtain as students. The Court cannot conclude the Debtor's testimony regarding the reason for the children's loan was untruthful.

### 1.      *2009 Toyota Camry*

A 2009 Toyota Camry was purchased by the Debtor's son on February 27, 2015 for $10,900.00. PFCU financed the purchase of the vehicle by loaning him $10,237.75 on the same date. The repayment terms required a monthly payment of $209.60. The son's loan from PFCU was refinanced with State Farm on November 4, 2015, and the payments were reduced to $208.95. The son is the primary driver. No evidence was produced that this car belongs to the Debtor, that she is the primary driver, or that she makes the payments on the loan secured by the car.

### 2.      *2012 Toyota Camry*

A 2012 Toyota Camry was purchased by the Debtor's daughter on March 15, 2015. The purchase of this vehicle was financed by PFCU in the amount of $14,630.00. The monthly payments required were $357.45. The Debtor authorized PFCU to withdraw these payments directly from her bank account and the payments were made every month from the Debtor's bank account for the time period April 1, 2015 at least through September 2015. The loan on the 2012 Toyota Camry was refinanced with State Farm on November 3, 2015, and the monthly payment was reduced to $307.01. The 2012 Toyota Camry was driven primarily by the Debtor's husband.

Plaintiff alleges that, in response to SOFA Question No. 3, the Debtor should have disclosed payments she made on the 2012 Camry within 90 days of the petition date. The Debtor answered "NONE" to Question No. 3. Question No. 3 is addressed differently to individual debtors with primarily consumer debts or business debts. Assuming the Debtor is a consumer

debtor, she would list all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of the case, <u>unless the aggregate value of all property that is affected by such transfer is less than $600.00</u>. If the Debtor is not primarily a consumer debtor as this Court has found, the Debtor is only required to list payments or transfers to a creditor made within 90 days immediately preceding the commencement of the case <u>if the aggregate value of all property affected by such transfer is more than $6,255.00</u>.

The Debtor's payments on the car loan in her daughter's name are not responsive to Question No. 3. This question only asks for payments to creditors; a creditor is someone with a claim. Since the Debtor was not a signatory on the note to PFCU, PFCU had no claim against the Debtor; therefore the payments to PFCU were not payments to a creditor. Moreover, the total payments made by the Debtor to PFCU on account of her daughter's car in the 90 days preceding the bankruptcy filing are $1,074.00. If the Debtor is a non-consumer debtor, as held by the Court in the Section 707 Order, the amount of these transfers would not aggregate enough to have been responsive to Question No. 3.

Plaintiff also alleges the Debtor should have responded to SOFA Question No. 14 by disclosing the 2012 Toyota Camry owned by her daughter as property owned by another person but that the Debtor holds or controls. The 2012 Toyota Camry is owned by the daughter and, while the Debtor drives the car occasionally, there was no evidence she held or controlled the vehicle. The Debtor used the vehicle as any parent might use the vehicle of their child but was neither the owner nor the primary driver of the car. Therefore, the Court finds this response to be accurate with respect to the 2012 Toyota Camry.

Last, Plaintiff contends the Debtor should have identified the 2012 Toyota Camry on Schedule B as property she owned because she made many of the car payments pre-petition.

The title to the car was not in the Debtor's name. For purposes of a false oath analysis, the Court cannot say that a debtor must assume that property is actually owned by the debtor when it is not in the debtor's name, at least not under the facts here. The Debtor did not have title to the vehicle and was not the primary driver of the vehicle. The Court therefore concludes the Debtor's failure to identify the 2012 Toyota Camry on Schedule B is not a false oath.

### 3.      *2005 Honda Odyssey*

The Debtor purchased a 2005 Honda Odyssey on April 16, 2015[1] for $11,338.00, which included fees and taxes. The purchase order for the vehicle, the title application for the vehicle and the title are all in the Debtor's name, and the Debtor signed the purchase order and the title application. The insurance on the car when it was purchased was in the name of the Debtor and her husband. PFCU financed $8,000.00 for the purchase of the car, loaning the funds to the Debtor's son. The source of the remaining $3,000.00 purchase price was never established. The monthly payment required was $240.92. The Debtor authorized payments for the vehicle to be made directly from her Wells Fargo bank account beginning in July 2015. At the September 2015 Hearing, the Debtor testified she made the $240.92 per month payment on this car. Nevertheless, the Debtor's bank statements for July through September 2015 do not reflect an automatic draft of the payments from the Debtor's bank account. Although the Debtor's statement regarding paying $240.92 per month for the Odyssey cannot be supported by documents, the Court cannot find the statement false because the Debtor agreed for PFCU to withdraw the funds from her bank account and it is possible some of the cash withdrawals from her bank account were used to make payments. At the September 2015 Hearing, the Debtor testified she primarily drove the Honda Odyssey. At the trial of the Section 727 action, she stated her daughter was now primarily driving the car and making the car payments. The Court

---

[1] One week after Plaintiff sought a *fi fa* in state court.

cannot conclude the Debtor's statements are false.  It is more likely the change in testimony reflects a change in usage.

The Debtor, in her testimony at the September 2015 Hearing, stated that she owned no cars but she acknowledged she drove the Honda Odyssey.  She stated the Odyssey was owned by her son who had the loan on the car.  The 2005 Honda Odyssey was not disclosed by the Debtor in her originally filed Schedule B.  The Debtor's Schedule B was amended on February 26, 2016 to disclose the Honda Odyssey, but this was after Plaintiff obtained a copy of the title and brought to the Debtor's attention that her statements were false.  The Debtor's testimony and Schedule B regarding ownership of the Honda Odyssey is false.

Plaintiff alleges the Debtor should have responded to SOFA Question No. 14 by disclosing the Honda Odyssey as property owned by another person (her son) but that the Debtor holds or controls. The Court finds the Debtor's response to SOFA Question No. 14 to be accurate.  The Debtor is the owner of the Honda Odyssey so she was not holding and controlling the Odyssey while someone else owned it.

Lastly, Plaintiff alleges that, in response to SOFA Question No. 3, the Debtor should have disclosed payments she made on the 2005 Honda Odyssey within 90 days.  The Debtor answered "NONE" to Question No. 3.  The Court determines the Debtor's response was correct. Question No. 3 asks for payments made to creditors.  PFCU was not a creditor of the Debtor on the 2005 Honda Odyssey because she was not obligated to PFCU on the loan.  Moreover, the payments she made on the Odyssey at most totaled $482.00, which is below the threshold for disclosure for both consumer and non-consumer debtors.

### 4.    _Insurance_

The insurance on all three cars was paid by the household, meaning that the insurance payments were made from a combination of the Debtor's and her husband's income.  The Court

finds that the insurance payments were $369.00 per month as of the petition date, but increased post-petition to $468.00 per month. The Debtor's Schedule J states that $369.00 per month is paid by the Debtor for insurance. The Debtor testified at the September 2015 Hearing that this $369.00 per month was the insurance cost as of the petition date for all three vehicles and that it was paid by her husband. The Debtor's interrogatory responses confirmed that the monthly insurance payment was $369.00. Nevertheless, at the trial of this matter, the Debtor testified that the $369.00 amount entered in Schedule J as insurance payments was meant to be the payment on her daughter's car (the 2012 Toyota Camry), even though that monthly car payment was $357.45. The $369.00 payment designated as insurance is a very specific number and the Court finds it highly unlikely that $369.00 was meant to be $357.45. In fact, the Court believes the $369.00 per month payment was the insurance on all vehicles and the Debtor's statement at the trial that it was meant to reflect the car payment is false.

### 5.   *Prior Vehicles*

The Virani family acquired three vehicles in February, March and April 2015, shortly before the filing of the Debtor's petition. It appears that one or more cars were surrendered in that same time period. Plaintiff alleges the Debtor should have disclosed in response to SOFA Question Nos. 5 and 10 that a GMC van, a Jeep and a 2002 Odyssey were surrendered. The Court finds that a 2001 GMC van which was in the Debtor's husband's name was surrendered in 2012. The Court finds a 2001 Jeep in the name of the Debtor's son was also surrendered, and a 2002 Honda Odyssey in the name of the Debtor's husband was also surrendered. No evidence was presented that any of the three surrendered vehicles were ever in the Debtor's name, so the Court cannot find the Debtor's answers were false.

Based on the foregoing, the Court concludes the following false oaths were made by the Debtor related to the cars: (1) the filing of the original Schedule B without disclosing the

Debtor's ownership of the 2005 Honda Odyssey, (2) the Debtor's testimony at the September 2015 Hearing that she owned no car, (3) the Debtor's trial testimony that the $369.00 entered on Schedule J as car insurance was not really an insurance payment but instead a payment on her daughter's 2012 Toyota Camry.     The Court concludes that each of the foregoing false oaths is material because each is important to determining the scope of the Debtor's assets and liabilities.

### B.     Income

Plaintiff argues the Debtor has greater income than what was identified on her Schedules because he contends her husband and children contribute regularly to the household.  Schedule I asks a debtor to identify income regularly received or contributions to expenses regularly received.  The Debtor's Schedule I shows $1,800.00 per month regularly provided by Mr. Virani to the household.  Plaintiff believes Mr. Virani contributes more.  He believes Mr. Virani's business was more lucrative than disclosed.  He notes Mr. Virani has paid other expenses, either directly or through his business, which indicate to Plaintiff that more income is available. Moreover, Plaintiff argues the Debtor's two children contribute to the household income based in large part on a review of the Debtor's bank account.

### 1.     Mr. Virani's Income

Mr. Virani's income comes from the operation of SHM, an event hall.  Mr. Virani operates the event hall on a cash basis, both for income and expenses.  Consequently, there are no books to speak of to back up Mr. Virani's assertions or to support Plaintiff's assertions.  The evidence shows that the event hall held some very successful events over the years.  In 2013, SHM's corporate return showed gross income of $135,185.00.  In 2014, its gross income was $176,078.00, and in 2015, the gross income of SHM was $189,780.00.  Because of this large

amount of gross income, Plaintiff believes Mr. Virani had access to more than $1,800.00 per month in income.

But, the gross income of SHM is not the same as its net income or cash available to the owner. The tax returns reflect expenses in the nature of rent, utilities, contract labor and the like which resulted in a reduction of the company's gross income. In 2013, according to both the SHM corporate return and Mr. Virani's individual return, he received $2,000.00 in wages as a W-2 employee and $7,058.00 of business income, for a total of $9,058.00.[2] In 2014, the SHM corporate return and Mr. Virani's individual return show he received $4,000.00 as a W-2 employee, and the net business income of SHM was ($2,523.00). But Mr. Virani received other rental income of $9,450.00 for a total income to Mr. Virani of $10,927.00. Finally, the 2015 SHM corporate tax return and Mr. Virani's individual return reflect he received $4,000.00 as a W-2 employee and $6,387.00 in net business income for a total income of $10,387.00.

Mr. Virani testified the amount he withdrew from SHM each month varied based on his need and the availability of cash. This statement alone is not atypical for a sole proprietor in a small business. Mr. Virani testified the amounts he withdrew ranged from $1,000.00 to $2,500.00 per month, an average of $1,750.00 per month (less than the amount the Debtor identified on Schedule I). In the Court's findings in its Section 707 Order, it noted that the 2013 tax return showed total income of $27,000.00, and the Court concluded there was no evidence in the record to indicate Mr. and Mrs. Virani have significant income that could be used to pay their creditors. The Court reiterates this finding. Finally, the Court notes that the $1,800.00 per month scheduled by the Debtor as Mr. Virani's income is $19,200.00 per year. The income reported by Mr. Virani to the IRS is less than that in each of 2013, 2014 and 2015, again not

---

[2] As will be discussed later, the tax return actually shows the $7,058.00 in business income in 2013 as attributed to the Debtor as the 100% owner of SHM, rather than Mr. Virani.

giving the Court any reason to believe he actually received more than an average of $1,800.00 per month.  If anything, the evidence suggests he made even less.

Plaintiff argues that a review of the Debtor's bank account shows cash deposits that indicate additional income.  Mr. Virani testified he did occasionally make deposits into his wife's bank account if the funds were needed.  A review of the evidence shows the following cash deposits in the Debtor's bank account:

| | |
|---|---|
| November 2014 | $   460.00 |
| March 2015 | $   240.00 |
| April 2015 | $     60.00 |
| May 2015 | $   150.00 |
| June 2015 | $1,486.00 |
| July 2015 | $      -0- |
| August 2015 | $   380.50 |
| September 2015 | $   780.00[3] |

The bank accounts do not reflect the source of the cash.  The Court notes cash was withdrawn from the bank at various times.  The cash deposited in the Debtor's bank account, according to the testimony, could have been from Mr. Virani, could have been from either of the Debtor's two children, or could have been a redeposit of cash that had previously been withdrawn.  Other than the total deposits in June 2015 (immediately prior to the filing of the petition) the remaining pre-petition deposits are minimal and do not indicate a substantial source of other income, a regular source of other income, or total other income in excess of the $1,800.00 per month identified in Schedule I.  Furthermore, during this time period, PFCU was automatically drafting from the Debtor's bank account the payment for the Debtor's daughter's car.  Both the Debtor and Mr. Virani testified the Debtor's daughter tried to deposit money in the Debtor's bank account to cover some of those car payments.

---

[3] The Debtor's 2015 tax return includes a Form 1099 for $1,300.00 and the Debtor testified those payments show up as additional deposits in her bank account.

Plaintiff argues that SHM was paying additional expenses of Mr. Virani which should count toward the calculation of income. In particular, Plaintiff points out the company was making payments to Plaintiff himself, Mr. Wread and Mr. Rupani. He also notes the company made payments of legal fees to Mills & Hoopes and to Debtor's counsel. Plaintiff therefore concludes that, because money is being paid on behalf of the Debtor and her husband, there must be greater income. In analyzing this argument, it is important to focus on the relevant timeframe. Schedule I, which is where the Debtor made her oath about Mr. Virani's income, asks the Debtor to estimate her income as of the date the form is submitted. The Debtor filed her petition on June 19, 2015, and the Schedule I was filed on July 24, 2015. The Debtor also represented her husband's income in Form 22A, also filed on July 24, 2015. This form asks for the debtor's average monthly income for the prior six months. The six-month period preceding the filing of the bankruptcy case runs from December 1, 2014 to June 18, 2015. Neither Schedule I nor Form 22A asks for Mr. Virani's income and contributions to the family for 2013, most of 2014, the second half of 2015, or any of 2016.

The payments to Plaintiff made on behalf of Mr. Virani began post-petition in 2016. Mr. Virani testified that at least some of the payments to Plaintiff came from the 2015 tax refund. Moreover, the Court has previously concluded the loan from Mr. Modi to the Debtor and Mr. Virani, although made personally, was for a business purpose, i.e., the operation of SHM. Consequently, if SHM made some of those payments to Mr. Modi in 2016, those payments would not necessarily reflect income to Mr. Virani. As to the payments to Mr. Wread and Mr. Rupani, no evidence was presented as to the exact amount or source or date of those payments. The testimony was that the Wread debt dates from 2005 and represents a failed prior business venture. The Rupani debt also relates to business ventures. Mr. Virani testified that SHM makes the payments on both Mr. Wread's and Mr. Rupani's debts and that SHM takes the interest

deduction for those obligations.  The evidence therefore does not demonstrate that SHM was making a payment on behalf of Mr. Virani on which it was not otherwise obligated or that it was not entitled to make.  Moreover, the evidence is not sufficient to allow the Court to determine if the amount paid to Mr. Wread and Mr. Rupani in the six months prior to the filing of the bankruptcy petition was more than the difference between $1,800.00 per month (as reported on Schedule I and Form 22A) and Mr. Virani's actual income.[4]

Plaintiff argues that SHM paid legal fees to Mills & Hoopes and those legal fees were really paid on behalf of Mr. Virani and should be included in his income.  The litigation between Plaintiff on one hand and SHM and the Viranis on the other began in 2013.  Mills & Hoopes represented SHM, and Mr. and Mrs. Virani, in those legal proceedings.  As a result of their representation, Mills & Hoopes received payments of $11,307.00, with a little over $28,000.00 remaining due and owing to Mills & Hoopes.  A review of the Mills & Hoopes statement shows that, during the six-month period prior to the filing of the bankruptcy petition, legal fees of $4,266.00 were received by Mills & Hoopes.  The testimony was that these payments were made by SHM.  SHM was a party to the litigation, and the payment by SHM of legal fees does not necessarily make those payments income to Mr. Virani.

Plaintiff showed that SHM made the payments to Mr. Altman on behalf of the Debtor for the filing of her bankruptcy petition.  All of the payments made by SHM to Mr. Altman were made post-petition, so even if those payments are considered income to Mr. or Mrs. Virani, they did not occur in the six-month period prior to the filing of the bankruptcy petition nor were they expected to be regular income to either of them.  The total amount paid to Mr. Altman post-petition for the Debtor's bankruptcy case was $3,265.00.  Additionally, SHM paid $1,240.00 to

---

[4] The scheduled income from Mr. Virani is $1,800.00 per month.  The reported income to the IRS is $866.00 per month according to the 2015 tax returns.  Thus, only if these "extra" payments exceed $1,000.00 per month (even if they were attributed as income to Mr. Virani) would they demonstrate that Mr. Virani made more than $1,800.00 per month.

Mr. Altman on behalf of Mr. Virani for the filing of his bankruptcy case.  This payment could be attributed as additional income to the Viranis.  Nevertheless, the Court finds these payments are not "regular" payments to support the Debtor and do not in and of themselves demonstrate that the statements made by the Debtor in her Schedule I and Form 22A are false.

So, while the Court understands Plaintiff's suspicion that Mr. Virani contributed more than $1,800.00 per month on average to the family, and while it is certainly possible that at times in the six months prior to the filing of the bankruptcy petition he contributed more than $1,800.00 per month, Plaintiff has not carried his burden of proving by a preponderance of the evidence that the Debtor's statement that Mr. Virani contributed approximately $1,800.00 per month in income was false.  As the Court noted in its Section 707 Order, nothing in the Debtor's or Mr. Virani's lifestyle suggests these debtors have more income than is disclosed.  While the family presently has three vehicles, none of them are new, and none of them are luxury vehicles.  They rent a home, and they have no other material assets and no lifestyle that suggests there is other income not being disclosed.  Rather, the evidence shows that the Debtor and her husband and her two children are simply doing what they can to make ends meet.

### 2.    *Children's Income*

The trial included much debate over the income of the Debtor's two children.  The Debtor's son was twenty years old when the bankruptcy petition was filed, and her daughter was nineteen years old.  At the September 2015 Hearing, the Debtor testified that her daughter was an unemployed college student and that her son worked part-time.  She stated the money he made covered his car expenses and spending money but that he did not contribute regularly to any household expenses.

The evidence at the Section 727 trial showed that the daughter's application for the car loan at PFCU dated March 3, 2015 reflected she was an event planner with SHM receiving

$1,000.00 per month and had held that position since January 1, 2014.  Her subsequent State Farm loan application dated November 2015 states she was a water meter inspector for three years making $30,000.00 a year.  The evidence showed and the Court finds that these two loan applications were completed by Mr. Virani.  The Court finds that the information in the two loan applications is incorrect.  Since the Debtor's daughter was only 18 years old at the time of the applications and had just graduated high school in 2014, it is highly unlikely she had a held a position with the water department for three years making $30,000.00 a year.  It is possible she worked part-time for her father at SHM as an event planner, and it is also possible she received compensation when she assisted at various events.  The Debtor testified her daughter did work part-time in one or more summers with the water department, but it was only a part-time job and she certainly did not make $30,000.00 a year.

Similarly, the Debtor's son stated in his car loan application to PFCU in April 2015 that he had worked with Antique Jewelry Addiction since December 2013 receiving an income of $1,500.00 per month for 50 hours per month.  This information could be correct since 50 hours per month is only a part-time job.  However, his application with State Farm in November 2015 stated he had worked with Jarod Jewelry for three years at $30,000.00 a year.  The evidence showed Mr. Virani filled out this application.  This information is incorrect.  The Court finds that both children at most had part-time jobs in the six months prior to the filing of the petition.  The information provided on the loan applications is false.

The evidence presented at the trial did not show the Debtor's children made consistent contributions to cover household expenses as of the petition date.  As stated above, the operative timeframe for the information provided in both Schedule I and Form 22A is important.  Schedule I is only an estimate of income as of the date the form is filed while Form 22A is meant to reflect the average monthly income for the six-month period prior to the filing of the bankruptcy

petition.  Schedule I, Form 22A and the definition of currently monthly income in 11 U.S.C.
§ 101(10A) all require the disclosure of income received from any source but on a regular basis
and paid toward the household expenses identified in Schedule J.  In this case, the children made
money and paid many of their own expenses including their car payments.  The children
contributed only occasionally to the household pre-petition.  As discussed above, review of the
Debtor's bank account does not reflect regular contributions by the children.  In the time period
identified in the bank statements submitted as exhibits, the amount of cash deposits in the
Debtor's bank account varies from $60.00 in April 2015 to $1,486.00 in June 2015.  The bank
account showed at least one deposit from extra work provided by the Debtor to her employer and
evidenced by a Form 1099.   But, the Court finds the Debtor's statements on Schedule I and
Form 22A that do not reflect any regular income from her children are not false because any
income made by the children was used to pay for their own expenses including their car
payments and any that was contributed to the family was done only occasionally.

> C.   **Attorney's Fees**

SOFA Question No. 9 asks the debtor to "list all payments made or property transferred
by or on behalf of the Debtor to any persons, including attorneys, for consultation concerning
debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy
within one year immediately preceding the commencement of this case".  The question then has
columns where the name and address of the payee is to be identified, the date of the payment is
to be identified, the name of the payor if other than the debtor is to be identified, and the amount
of money paid is to be identified.  In response to this question, the Debtor responded that
$1,750.00 was paid to Evan Altman in July 2015.  The Debtor made no disclosure that the source
of the payment was anyone other than herself.  The evidence showed, however, that the Debtor
made none of the payments to Mr. Altman and that Mr. Altman did not receive $1,750.00 at the

time the SOFA was filed on July 20, 2015.  In fact, Mr. Altman had only received $700.00 by

that time, all of which was paid by Mr. Virani.

The Court concludes the Debtor's response to Question No. 9 is a false oath.  The Court

also concludes this false oath is material because it relates to the Debtor's use of money after the

filing of the petition.  The amount paid is relevant to determining the Debtor's financial

condition.  The source of the payment is important to show not only the financial situation of the

Debtor at the time the payment was made, but also so that the Court and creditors can ascertain

whether other parties may be in a position to influence the Debtor and her counsel because of

their payment.

### D.    Ownership of S.H. Mart

SOFA Question No. 18 asks an individual debtor to identify the "names, addresses, tax

payer identification numbers, nature of the businesses, and beginning and ending dates of all

businesses in which the debtor was an officer, director, partner, or managing executive of a

corporation … within six years immediately preceding the commencement of this case, or in

which the debtor owned five percent or more of the voting or equity securities within six years

immediately preceding the commencement of this case".  In response to this question, the Debtor

checked "NONE".  SOFA Question No. 10 asks the Debtor to list all property other than

property transferred in the ordinary course of business which was transferred within two years

immediately preceding the commencement of the case.  Again, the Debtor checked "NONE" in

response to this question.

Nevertheless, the Court finds the Debtor was the CEO, CFO, registered agent and

primary bank account holder for SHM at least in 2012.  The Court also finds the Debtor was the

100% owner of SHM throughout 2013 as evidenced by SHM's 2013 tax return.  SHM's 2014 tax

return reflects Mr. Virani as the 100% owner.  This confirms there was a transfer of the ownership of SHM from 2013 to 2014.

SHM, the relevant information about it, and the Debtor's involvement with it should have been disclosed in response to Question No. 18.  Moreover, because the 100% ownership in SHM was transferred at least in 2014, such transfer occurred within two years prior to the filing of the bankruptcy petition and should have been disclosed in response to Question No. 10.  Finally, in answer to the Chapter 7 Trustee's inquiry at the 341 meeting, the Debtor answered under oath that she was never a shareholder in SHM.  This information is not true for the period of 2012 – 2013.  The Court finds the omissions made by the Debtor in her SOFA and in her 341 meeting with respect to SHM are false and the information was material.  Ownership in a business relates to the Debtor's financial condition and the Trustee can only investigate the validity of any transfer of ownership interest in a business if she is aware that such transfer occurred.

### E.     Tax Refunds

The Debtor and her husband received a tax refund of $4,388.00 for tax year 2014.  This refund was deposited into the Debtor's bank account on July 22, 2015, post-petition and two days before her Schedules were filed.  Question No. 18 on Schedule B specifically asks for the debtor to identify "other liquidated debts owed to debtor including tax refunds."  The case law is clear that tax refunds for the year prior to the filing of the bankruptcy petition are property of the estate.  Kokoszka v. Belford, 417 U.S. 642 (1974).  The Debtor and her husband were due the refund at the time of the filing and the refund should have been identified on Schedule B in response to Question No. 18.  The Court determines the Debtor's failure to disclose the tax refund for 2014 was false and material.

Plaintiff argues the majority of the tax refund was the Debtor's property, while the Debtor's counsel argues a significant portion is attributed to her husband.  The exact amount of

the refund attributable to the Debtor need not be determined at this time.  There is no doubt that a sizeable portion of the refund (at least one-half) is attributable to the Debtor and should have been disclosed on Schedule B.  The Debtor has amended Schedule B to identify the entire refund as hers and also to claim the entire amount as exempt.  While Plaintiff objects to this amendment and to the exemption, a determination of the Debtor's entitlement to the exemption is a separate proceeding and will be determined at a later date.

Plaintiff also contends the Debtor's 2015 tax refund should have been identified.  The bankruptcy petition was filed in June 2015.  At that point, tax returns were not due, as the yearly income of the Debtor and her husband, and any credits to which they were entitled, could not be calculated.  A review of the Debtor's 2014 and 2015 tax returns shows the Debtor had very little income tax withheld.  The tax refunds are virtually all the result of tax credits which can only be calculated when a total year's income is available and the IRS makes available the information on which the credit can be calculated.  Therefore, the Court finds it was not necessary for the Debtor to identify in Schedule B a potential 2015 tax refund.

Last, Plaintiff argues the Debtor made false statements regarding the use of the tax refund.  The Debtor testified her husband used the money.  She answered in an interrogatory the money was used to pay $1,000.00 to Mills & Hoopes, $1,000.00 on her son's behalf for books and supplies, $1,000.00 on her daughter's behalf for books and supplies, $450.00 to an accountant, and the balance used by her daughter for a rideshare program.  In reviewing the Mills & Hoopes accounts, the Court can only identify a $500.00 payment in July 2015.  None of the other expenses listed by the Debtor can be verified.  The facts show the entire refund was deposited in the Debtor's bank account on July 22, 2015 and all but $38.00 was withdrawn the very next day in cash.  The Court finds the Debtor really does not know how the tax refund money was spent.  She testified on more than one occasion her husband was in charge of the

finances and was the one who took the tax refund money and spent it. Based on those facts, the Court cannot find that the Debtor made a false statement with respect to how the tax refund was spent.

**F.      Petition Errors**

Plaintiff alleges the Debtor made numerous errors in connection with filing her bankruptcy petition. First, the Debtor's initial petition was filed with the last name "Alivirani". The Debtor's name should have been printed as "Ali Virani". Second, where the petition asks the Debtor to identify all prior bankruptcy cases filed within the last eight years, the Debtor stated none. In fact, the Debtor had a prior bankruptcy case, No. 10-92602, which was a petition filed under Chapter 13 of the United States Bankruptcy Code on November 1, 2010. The case was dismissed on December 28, 2010 for the Debtor's failure to pay a filing fee. The Debtor's bankruptcy petition also asked whether her spouse had any pending bankruptcy cases. Again, the Debtor stated "NONE" on the petition, despite the fact her husband Ramzan Ali Virani had filed a petition only an hour and a half earlier on the same day. Mr. Virani was represented in the filing of his case by Evan Altman, the same attorney who assisted this Debtor in her *pro se* bankruptcy filing. Lastly, Plaintiff contests the statement on the Debtor's petition that her case is one of primarily consumer debts. This Court found in its Section 707 Order that the debts of this Debtor are not primarily consumer debts, but instead are primarily business-related debts. The Debtor subsequently filed an amended petition, this time noting the debts were business debts, in accordance with this Court's Section 707 Order. Plaintiff contests this statement and continues to maintain that the debts are primarily consumer debts.

Most of the issues raised by Plaintiff regarding errors in the original petition were addressed by the Court in its Section 707 Order. There, the Court noted that the typing of her name as "Alivirani" without any spaces as opposed to "Ali Virani" could cause the petition to be

indexed under a different alphabetical letter, but the Court did not find that the information was misleading. The Court noted that the Debtor put her correct Social Security Number on the form. The evidence also showed the Debtor's name of "Alivirani", without a space, was used on her driver's license and in some of her W-2 statements. The Court finds the presentation of the Debtor's name was not a false oath.

With respect to the Debtor's prior bankruptcy case, the Court noted in its Section 707 Order that the Debtor should have disclosed the prior Chapter 13 case. At trial, she stated she did not view that as a bankruptcy case because she did not complete the case. She did not even pay the filing fee. The Debtor is incorrect, and the statement that no prior bankruptcy cases were filed is false and material. Next, the Debtor's statement that her spouse did not have a pending bankruptcy case was false. The evidence was clear that her husband's bankruptcy petition was filed an hour and a half or so prior to her own. So, the statement that there were no pending bankruptcy cases was false and is material because when spouses file separate bankruptcy cases as opposed to a joint case, it is necessary for the trustee to review the other spouse's case to ensure consistency in the disclosure and verify that assets and liabilities are appropriately documented.

Finally, Plaintiff's dispute about whether the Debtor's debts are primarily consumer or business debts has no bearing on this Section 727 action. The Debtor (and Mr. Altman) stated their initial understanding that the debts were primarily consumer debts. The Court believes this was done without much consideration, probably because the vast majority of individuals who file bankruptcy have only consumer debts. The Court found to the contrary in its Section 707 Order. So when the Debtor amended her petition to state the debts were primarily business debts, she was amending the petition to make it consistent with the Court's Order. Plaintiff disputes whether the debts are primarily business debts, but his argument is irrelevant to a Section 727

action regarding whether there was a false oath and is irrelevant even in his Section 707 Motion to Dismiss.  In the Section 707 Order, the Court found first that the debts were primarily business debts and that even if they were primarily consumer debts, the Plaintiff's motion would fail due to the Debtor's income level and lack of standing.  Plaintiff's argument regarding whether the Debtor is primarily a consumer or business debtor has been dealt with and further argument is unnecessary.

### G.    SOFA Errors

Plaintiff argues there are numerous errors in the Debtor's SOFA in addition to the SOFA errors already discussed.  First, Question No. 1 asks the Debtor to state her 2013 income.  The response says $-0-.  This answer is incorrect as her W-2 and tax return show she made $21,505.81 in 2013.  This information was available to the Debtor at the time she filed the SOFA.  The answer of $-0- is false and the information is material for the Trustee and creditors to understand the Debtor's history of income.[5]

Next, Plaintiff argues the Debtor answered Question No. 3 to the SOFA incorrectly. Plaintiff contends the Debtor should have identified in response to Question No. 3 payments to PFCU on the $12,000.00 personal loan which the Debtor obtained in 2015 and the transfers made by PFCU on account of the Debtor's obligations from the $12,000.00 personal loan.  On March 31, 2015, the Debtor borrowed $12,000.00 from PFCU as a personal loan.  The monthly payment required was $268.29 beginning May 15, 2015.  The two payments made by the Debtor in the 90 days preceding the filing of the bankruptcy petition were payments to a creditor, but because they did not aggregate the $600.00 minimum threshold for consumer debtors (much less the higher threshold for non-consumer debtors), the Debtor did not need to identify those payments in answer to Question No. 3.

---

[5] According to the SHM 2013 corporate return, $7,058.00 of business income was attributable to the Debtor as well.

When the $12,000.00 loan was made, PFCU used a portion of the proceeds of the loan to pay some of the Debtor's old debts. This Court found in its Section 707 Order that $3,740.16 of this loan was used to pay off old consumer debts of the Debtor such as credit card debt. Since this amount was paid within 90 days of the petition date, if the Debtor were considered a consumer debtor, such payments should have been identified in response to Question No. 3. However, for a debtor whose debts are not primarily consumer debts, this transfer does not rise to the level that needed to be disclosed in response to Question No. 3.

Based on the foregoing, the Court concludes the Debtor's response to Question No. 3 on the SOFA is not false. The Court has already concluded the Debtor was not a consumer debtor and therefore none of the transfers identified by Plaintiff reach the aggregate level of $6,255.00 needed for disclosure.[6] Even if the Debtor were considered to be a consumer debtor, only the portion of the PFCU loan to the Debtor used to pay off old debts of the Debtor in excess of $600.00 would have been disclosed. While responses to Question No. 3 are material and do need to be provided to the Trustee, given the uncertainty regarding the nature of the Debtor's debt and given that the transaction occurred as part of a loan transaction which was disclosed in the Debtor's Schedule F, the Court concludes any failure to disclose the use of the PFCU loan proceeds to pay off old debt is not material.

## H.    __Schedule Errors__

Plaintiff next contends there are a number of errors in the Debtor's Schedules other than those identified above. Plaintiff contends the original Schedule C is false because the 2005

---

[6] Some courts view the "aggregate value" language listed in Question No. 3 as the aggregate of all payments made to all creditors, regardless of what is paid to any individual creditor, see Cadle Co. v. Leffingwell (In re Leffingwell), 279 B.R. 328, 347-48 (Bankr. M.D. Fla. 2002), whereas others look to aggregate payments made to each separate creditor during the relevant prepetition period, see Kaler v. Schrader (In re Schrader), 2006 WL 4392771, at *8 (Bankr. D.N.D. Aug. 11, 2006). It does not matter which approach the Court takes in the present case, as even if the funds paid to PFCU for the 2012 Toyota Camry were considered for the purposes of Question No. 3, the total amount paid to creditors would still be less than the $6,225 threshold required for non-consumer debtors.

Honda Odyssey and 2012 Toyota Camry are not identified and no exemption therein is taken. Even if both the 2005 Honda Odyssey and the 2012 Toyota Camry are property of the Debtor, a failure to identify property as exempt does not make the oath false. A debtor can always choose not to exempt property that she owns. Moreover, the Debtor has amended her Schedule C to claim an exemption in the 2005 Honda Odyssey which she owns. She does not own the 2012 Toyota Camry and therefore could not claim an exemption in it. This omission from Schedule C is not a false oath.

Next, Plaintiff argues Schedule D is incorrect because Mills & Hoopes is listed as a secured creditor. The Court notes that, although Mills & Hoopes is identified on Schedule D, there is no amount of claim stated and in fact the description of the debt says, "Assignee and notice for Mr. Modi". The testimony at the trial was that Mr. Altman mistakenly understood Mills & Hoopes was the attorney for Plaintiff and believed Plaintiff had assigned his judgment to Mills & Hoopes. This understanding was entirely incorrect. Further, Mills & Hoopes should have been listed on Schedule F as an unsecured creditor due to their representation of the Debtor in litigation with Plaintiff. Nevertheless, the Court finds any misstatement here is immaterial because it is not about the Debtor's assets. Schedule D states no dollar amount for the liability, and it clearly designates the understanding at the time that Mills & Hoopes was representing Plaintiff.[7] The fact that Mills & Hoopes was listed on Schedule D and not on Schedule F, while erroneous, is not material. They received notice of the bankruptcy case and had an opportunity to participate in it.

Plaintiff also argues Mills & Hoopes should have been identified on Schedule H as a creditor for whom there are co-debtors. Plaintiff appears to be correct in this regard. Mills &

---

[7] This statement, while not material in and of itself, is further evidence of the Debtor's failure to read carefully the Schedules before she signed them as it would have been obvious to her that Mills & Hoopes did not represent Mr. Modi.

Hoopes represented the Debtor, Mr. Virani and SHM in litigation with Mr. Modi, so Mills &
Hoopes could be a creditor of all of the parties for whom they provided representation.  As such,
the other parties would be co-debtors with the Debtor.  The Court finds, however, that any
misstatement here is not material in this context.  The Debtor never made any payments to Mills
& Hoopes, and it was clear from the testimony she was unaware of the financial arrangements
with Mills & Hoopes.  Both Mr. and Mrs. Virani viewed the obligation to pay the attorneys' fees
to be that of SHM.  The Court finds therefore that, even if Schedule H is incorrect, the omission
is immaterial.

Plaintiff argues the Statement of Intention filed by the Debtor is incorrect.  He contends
she should have stated her intention to keep both the Honda Odyssey and the Toyota Camry.  As
it turns out, the Debtor owns the Honda Odyssey.  She is not, however, liable on the note for it.
The Court can understand then why she would not have stated she was reaffirming a debt she did
not owe.  Similarly with respect to the Toyota Camry, the Debtor does not own the car nor was
she obligated on the note.  She would not have obligated herself to reaffirm the debt for which
she was not responsible.

The Court has discussed above whether the income listed on Schedule I is correct.
Plaintiff alleged the Debtor should have disclosed income from her children and that Mr. Virani
contributed more than $1,800.00 per month to the Debtor's household.  But in addition to the
discussion about total income, Plaintiff argues Schedule I is incorrect because the attached
Business Expense Form should have been completed in full.  Instead, only one line is completed
– total income $1,800.00.  The Court notes, however, the form only asks for information about
the Debtor's business, and income from the Debtor's business.  By the time the petition was
filed, SHM was not the Debtor's business, but was her husband's.  The Court therefore finds the
failure to complete the details of the Business Expense Form is not a false oath.

The Debtor's Schedule J is to be completed with the Debtor's expenditures as of the date the petition was filed. The Debtor's original Schedule J was filed on July 20, 2015 and then amended on August 12, 2015 [Docket Nos. 18 and 29 respectively]. The Debtor's Schedule J, both original and as amended, is confusing, particularly when compared to her husband's Schedule J. His Schedule J was filed originally on July 15, 2015, and amended on August 12, 2015. Both Debtors testified at the September 2015 Hearing, and the Court found, that the two debtors did not ordinarily allocate expenses between themselves. Instead, they acted as a single household with both parties contributing and making payments as necessary. Nevertheless, it appears some attempt was made by Mr. Altman, the attorney for both of the Viranis, to allocate household expenses between the two debtors. This attempt by Mr. Altman appears arbitrary. Moreover, the expenses allocated to this Debtor do not dovetail with the expenses allocated to Mr. Virani in his bankruptcy case, either on the original Schedule J or the amended Schedule J. Thus, some expenses are double counted, and some are not counted at all. Finally, it is clear to the Court that Mr. Altman allocated the expenses between the two debtors in an effort to demonstrate that Mr. Virani could make a Chapter 13 payment of $400.00 per month and that the Debtor had insufficient net income to require her to file a Chapter 13 case. Because of this result-oriented approach, numerous inaccuracies are found in the Debtor's Schedule J, both original and as amended. In particular, Plaintiff challenges the Debtor's statements that she spends $369.00 per month on vehicle insurance, that her husband spends $400.00 per month on a Chapter 13 plan payment, and that her husband allocates $100.00 per month for tax payments, and challenges the omission of the Debtor's payments on the 2012 Camry.

The Debtor's Schedule J, both original and as amended, were accurate as to Mr. Virani's $400.00 per month Chapter 13 plan payment as of the petition date. His case was pending at the

time the Debtor filed her petition and filed both of her Schedules J.  His case was not dismissed until September 15, 2015.  Thus, the $400.00 per month expense on Schedule J is not false.

Next, both the Debtor's original and amended Schedule J show that Mr. Virani is allocating $100.00 per month for the payment of taxes.  Even if a debtor has not historically set aside money for taxes, if a history of tax liability shows such payments are necessary, it is common for a Chapter 13 Trustee to require the allocation of monthly income for tax payments.  In this case, however, Mr. Virani not only had no history of setting aside tax payments, he had no history of owing taxes.  The 2013, 2014 and 2015 tax returns were examined by the Court and Mr. Virani had no tax withheld in any of the years.  Instead, the Viranis received a combined tax refund consisting primarily of earned income and other credits.  Given this history, the allocation of $100.00 per month for taxes for Mr. Virani was false.  This allocation is also material because it leads to the mistaken belief that the Viranis have $100.00 less per month available for the payment of creditors.

Both of the Debtor's Schedules J state she paid $369.00 per month in car insurance and the Court has found as a fact that insurance on all three cars cost $369.00 per month as of the petition date.  While Mr. and Mrs. Virani also testified Mr. Virani paid the insurance expense, the Court finds the expense proper on the Debtor's Schedule J because it is not included in Mr. Virani's Schedule J.

At the trial, the Debtor changed her story to say the $369.00 per month designated as vehicle insurance was actually the payment on the daughter's car.  She should have acknowledged she did not include in Schedule J the monthly payment that was made on the daughter's car.  As discussed above, the daughter's car is in the daughter's name and the loan is also in the daughter's name.  The Debtor, however, signed an agreement with PFCU that the car payment for the 2012 Toyota Camry would be automatically withdrawn from her bank account.

The amount of $357.45 was withdrawn regularly by PFCU from the Debtor's bank account for the period of April 2015 through September 2015.  Thus, this regular expense should have been indicated in the Debtor's Schedule J.  The Debtor's failure to disclose this regular payment is false and is material, because it demonstrates the Debtor's expenses and the amount available for payment.

### I.      Intent to Deceive

Once the Court has determined that a material omission or misstatement has been made, it must determine if it was made knowingly and with intent to deceive.  Intent may be inferred from circumstantial evidence and "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727."   Taras, 2005 WL 6487202, at *4.  "[A]though not every single item of assets need be schedule[d] and valued, 'there comes a point when the aggregate errors and omissions cross the line past which a debtor's discharge should be denied.' … The cumulative effect of a number of false oaths by the debtor with respect to a variety of matters establishes a pattern of reckless and cavalier disregard for the truth by the debtor."  Neary v. Stamat (In re Stamat), 395 B.R. 59, 74 (Bankr. N.D. Ill. 2008). (cites omitted), aff'd, Stamat v. Neary, 635 F.3d 974 (7th Cir. 2011); see also Dilbay v. Demir (In re Demir), 500 B.R. 913, 920 (Bankr. N.D. Ill. 2013).  The debtor's attention to detail is critical because "[r]eceiving a discharge in bankruptcy is a privilege and not a right.  Debtors have a responsibility to make certain the information they provide is accurate.  They have a responsibility to respond truthfully and in a timely fashion to requests of the trustee or the Court. They also are responsible for the accuracy and truthfulness of all documents they sign and file under penalty of perjury."  Pergament v. Gonzalez (In re Gonzalez), 553 B.R. 467, 470 (Bankr. E.D.N.Y. 2016).  Factors to consider in determining whether debtors exhibited a reckless disregard or indifference to the truth include "(a) the serious nature of the information sought and

the necessary attention to detail and accuracy in answering; (b) a debtor's lack of financial sophistication as evidenced by his or her professional background; and (c) whether a debtor repeatedly blamed recurrent errors on carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies." <u>Gonzalez</u>, 553 B.R. at 474 (cites omitted); <u>see also</u> <u>Kohut v. Wandrie (In re Wandrie)</u>, 563 B.R. 238 (Bankr. E.D. Mich. 2017); <u>Cadle Co. v. Leffingwell (In re Leffingwell)</u>, 279 B.R. 328 (Bankr. M.D. Fla. 2002).

After a review of the evidence and the facts determined by the Court, the Court has found the following omissions and representations made by the Debtor to be false and material:[8]

1.    The Debtor's response to SOFA Question No. 1 stating that her 2013 income was $-0-;

2.    The Debtor's failure to identify the 2005 Honda Odyssey as an asset on Schedule B;

3.    The Debtor's failure to disclose the expected 2014 tax refund on Schedule B;

4.    The Debtor's inaccurate statement regarding the payment of attorney's fees to Evan Altman in response to SOFA Question No. 9;

5.    The Debtor's failure to answer SOFA Question No. 18 truthfully by disclosing her ownership of SHM and her management position of SHM within six years prior to the filing of the bankruptcy case;

6.    The Debtor's failure to answer SOFA Question No. 10 truthfully by disclosing the transfer of the ownership of SHM from the Debtor to Mr. Virani;

7.    The Debtor's testimony at the 341 meeting that she never owned an interest in SHM;

---

[8] The Debtor's own written closing argument identified twelve "technical omissions or inaccuracies in Debtor's petition, Schedules and SOFA."

8.      The Debtor's failure to include in Schedule J the monthly payments of $357.45 on her daughter's car;

9.      The Debtor's inclusion of $100.00 per month for taxes on Schedule J;

10.     The Debtor's testimony that the $369.00 per month identified as vehicle insurance was in fact the payment on her daughter's car;

11.     The Debtor's testimony at the September 2015 Hearing that she owned no cars and pays $240.92 per month on the Honda Odyssey;

12.     The Debtor's statement on her petition that she had no prior bankruptcy filing; and

13.     The Debtor's statement on her petition that her husband had no pending bankruptcy case.

In response, the Debtor states these omissions and misrepresentations were mistakes, or were the result of counsel action, or made in reliance on her husband.  In some instances she amended the filings to correct the information, but not in all.  She also defends her actions based on challenges of language and background.

The Debtor's standard response to every single misrepresentation and omission was that it was a "regrettable" mistake.  It is the Debtor's responsibility, however, to ensure the documents she signs are accurate.  This requires the Debtor to do more than simply assume the information provided by her husband is correct.  The Debtor must read the documents critically and use her own independent judgment.  She stated at her 341 meeting and at trial that she had read the documents and they were accurate.  The Court finds this to be untrue.  For example, had the Debtor truly read the SOFA, she would have known immediately that she did not have zero income in 2013.  She knew it immediately at trial.  She knew she worked in 2013, and she knew she had income, so had she truly read the SOFA she would have known that answer was

incorrect.  She also knew Mills & Hoopes did not represent Plaintiff and she knew she had deposited her tax refund in her bank account two days before.  She also knew the payment on her daughter's car was being drafted from her bank account.  Had she reviewed the Schedules and SOFA she would certainly have seen these errors.  The Court also notes the Schedules and SOFA were filed the first time more than a month after the Debtor filed her initial *pro se* petition and after the Court granted an extension of time to do so.  This is not a situation where the Schedules were prepared hurriedly; the Debtor had the time to gather the relevant information, review the draft schedules and make any changes that needed to be made.

The Debtor relies on her lawyer and her husband for many of the misrepresentations and omissions.  The Debtor was not served well by her counsel in many respects (in particular the division of household expenses between the Debtor and her husband), but counsel cannot know the actual facts unless the Debtor tells him.  Here, only the Debtor and her husband would have known the actual amount of income received, or the actual amount of payments made.  Moreover, no evidence was presented that any of these specific omissions and misstatements were answered in a way directed by her counsel (except perhaps the attorney's fee question).

The Debtor and her husband both testified, and the Court finds, that Mr. Virani was in control of the family finances.  Mr. Virani largely provided the information for the Debtor's Schedules.  The Debtor testified credibly that Mr. Virani made the financial decisions and provided the directions for most of the family's financial transactions.  The independent evidence supports this conclusion.  It was Mr. Virani who had his children borrow money for the family to purchase the 2005 Honda Odyssey and 2012 Toyota Camry for family use.  It was Mr. Virani who filled out the loan applications at PFCU and State Farm and had his children sign them.  It was Mr. Virani who had the Debtor borrow $12,000.00 from PFCU, the vast majority of which was used to pay his business expenses.  It was Mr. Virani who used the entire tax refund and

provided the only testimony as to its use.  While the Court appreciates the difficult position a debtor may be in when it is the debtor's spouse who is primarily in control of the finances, that does not eliminate the debtor's duty and responsibility to make sure the Schedules are correct.  A debtor cannot turn a blind eye to the spouse's financial actions and expect not to pay some of the price for those actions.

The Debtor also argues in her closing that some of the omissions and misstatements are based on challenges of language and background.  The Court does not believe language barriers or background contributed to most of the misstatements and omissions. The Debtor and her husband have resided in the United States for sixteen years.  The Court notes the Debtor does not have a finance background and is not a sophisticated financial investor.  Nonetheless, the Debtor has been gainfully employed at least for the last three years as a medical assistant which requires a post-high school education and being involved with patients and other people.  She maintains her own bank account, and she, in the Court's judgment, is fully capable of determining and understanding the actions of her husband.  Mr. Virani has had his own business for a number of years.  He has previously filed a bankruptcy case and received a discharge.  The Debtor has previously filed a bankruptcy case.  Her SOFA and testimony reflect several lawsuits to which she has been party.  The Court cannot conclude the Debtor is unsophisticated to the point of being unable to understand her duties as a bankruptcy debtor and the questions asked on the SOFA and Schedules.

Finally, the Debtor argues the Schedules were amended to correct some of the errors.  The Debtor amended her petition to correct the statement regarding her prior bankruptcy filing and the pending bankruptcy case of her husband.  The Debtor amended her Schedule B to disclose her ownership of the 2005 Honda Odyssey, after Plaintiff obtained independent verification of the fact.  The Debtor made one final amendment during the trial of the Section

727 action to identify the tax refund on Schedule B and to claim an exemption in it.  All of the omissions and misstatements, however, have not been corrected.  While correcting previously erroneous schedules can be some evidence of a lack of intent to defraud, "this inference is 'slight where the debtor has … amended his schedules after the trustee or creditors have already discovered what the debtor sought to hide'." Gonzalez, 553 B.R. at 474 (cites omitted).  "Coming clean about false oaths made with fraudulent intent well after the fact is better than not doing so, but it does not wipe away the fact that [d]ebtor made the original false oaths, for § 727(a)(4)(A) purposes." Wandrie, 563 B.R. at 257.

In assessing the Debtor's explanations for omissions and misstatements, the Court must assess the credibility of the Debtor and her husband.  Unfortunately, the credibility of Mr. Virani, and to a lesser extent the Debtor, is suspect.  Both exhibited a willingness to say or write down on an application the information they thought the Court, bank, or other relevant party wanted to hear, regardless of its truth.  The evidence showed the loan applications submitted for the Debtor's son and daughter both to PFCU and State Farm are incorrect.  Both applications for both children were facilitated by Mr. Virani.  The information provided regarding the employment and income of both children was incorrect.  Both State Farm applications showed each child had been employed for three years making $30,000.00 per year.  Given that the Debtor's daughter was only eighteen at the time, that simply is not true and the Debtor testified that was not true.  Mr. Virani also testified the information was incorrect as to both children.  Both the Debtor and her husband stated at separate times that these applications were showing the family income of $30,000.00 rather than the individual income of the applicant as requested by the applications.  Their explanation was that, if they had not shown a $30,000.00 income, the

children would not have received the loans.[9]  The Court was struck by this testimony – the statements were made without remorse or embarrassment, as if this is the way it is always done. It is not.  Applicants for bank loans as well as debtors in bankruptcy cases are expected to be fully truthful.  While these misstatements regarding the children's income and employment history were made to the banks and not to the Court, they show the Court a willingness of both the Debtor and her husband to lie to achieve a desired result.  Furthermore, the Debtor's candor in describing this willingness to the Court demonstrates further a lack of care with regard to the truth.  This approach to the truth was further confirmed by the Debtor's testimony regarding car insurance on the final day of the trial.  The Debtor's Schedule J throughout the course of the case had shown she paid $369.00 per month for car insurance.  The Debtor had testified to this fact in September 2015 and had responded to answers to interrogatories restating the same information. But by this last day, Plaintiff was pointing out to the Debtor that she had not identified in Schedule J the monthly payment she was making by automatic withdrawal on her daughter's car. Suddenly the Debtor decided the $369.00 identified as insurance was actually the car payment even though the car payment was only $357.00.  This statement is simply not true and is further evidence of the Debtor's desire to please the decision maker by saying what she thinks the decision maker wants to hear.  With this background in credibility, the Court is skeptical about the explanations for the misstatements and omissions provided by the Debtor.

   The Court recognizes the Debtor relied on her husband to a large extent, but this is the Debtor's case only – it is not her husband's case and it is not a joint case.  The Debtor testified at her 341 meeting as well as at the trial that she reviewed the SOFA and the Schedules and that they were correct.  It was her duty to have reviewed the SOFA and the Schedules and to make them correct.   While any one of these misstatements or omissions alone is probably an

---

[9] The Court regrets on the children's behalf that their father is using their credit to obtain property for the use of the family.

insufficient basis for denial of a discharge,[10] the Court cannot ignore the cumulative effect of the misstatements and omissions.   When all of the omissions and misstatements are reviewed together with the Debtor's and husband's approach to stating whatever they think is necessary to obtain the result they desire, the Court concludes the Debtor exhibited a reckless indifference to the truth sufficient to constitute fraudulent intent and to support a denial of her discharge under Section 727.

## II.    Concealment – 11 U.S.C. § 727(a)(2)

Plaintiff argues the Debtor concealed the 2005 Honda Odyssey and the 2012 Toyota Camry and therefore her discharge should be denied under 11 U.S.C. § 727(a)(2).  Section 727 of the Bankruptcy Code provides

> (a)  The court shall grant the debtor a discharge, unless *(\*)* –
>
> … (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
>> (A)  property of the debtor, within one year before the date of the filing of the petition; or
>>
>> (B)  property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).  Thus, to deny a debtor a discharge under this section, Plaintiff must show the Debtor transferred or removed or concealed his property, within the requisite time period, and had the requisite intent to hinder, delay or defraud.  "Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets."  6 Collier on Bankruptcy ¶ 727.02[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. Supp. 2013).

---

[10] The Court refused to dismiss the case on the grounds, *inter alia*, that she did not disclose her prior case or her husband's pending case.

Under the broad definition of transfer in 11 U.S.C. § 101(54), even a disposition of possession, custody or control could qualify as a transfer.  Removal, on the other hand, is "an actual or physical change in the position or locality of property of the debtor resulting in a depletion of the debtor's estate."  Id., ¶ 727.02[6][a] (16th ed. Supp. 2010).  Concealment includes physical hiding of the property, and "other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge owed information."  Id. ¶ 727.02[6][b]   (citing San Jose v. McWilliams, 284 F.3d 785 (7th Cir. 2002); Keeney v. Smith (In re Keeney), 227 F.3d 679, 682-83 (6th Cir. 2000)); see also Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1293 n.1 (10th Cir. 1997).  The concealment of the interest must occur within the year prior to the bankruptcy filing.  Transfers made more than one year prior to the petition date may fall within Section 727(a)(2) if the debtor retained a concealed interest in the asset.  See R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229 B.R. 253, 259-60 (B.A.P. 1st Cir. 1999); Rotella & Assoc., P.A. v. Bellassai (In re Bellassai), 451 B.R. 594, 602 (Bankr. S.D. Fla. 2011).

Finally, a creditor proceeding under Section 727(a)(2) must prove the debtor possessed an actual intent to hinder, delay or defraud creditors or the trustee when he transferred, concealed or removed his or the estate's property.  The Eleventh Circuit has made clear that a preferential transfer is not the type of transfer which will bar a discharge.  Miller, 39 F.3d at 307; see also Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936); Rutter v. Gen. Motors Acceptance Corp., 70 F.2d 479, 481-82 (10th Cir. 1934); Ins. Office of America, Inc. v. Wall (In re Wall), 2008 WL 8792259, at *4 (Bankr. S.D. Ga. Mar. 31, 2008).  Constructive fraud is also insufficient.  Miller, 39 F.3d at 306.  Actual fraudulent intent, however, may be inferred from the circumstances surrounding the transfer or concealment.  Emmett Valley Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992).  The actions at issue should demonstrate

"culpable intent", such that the actions are "blameworthy in an equitable sense." Belmont Wine
Exch., LLC v. Nascarella (In re Nascarella), 492 B.R. 914, 916 (Bankr. M.D. Fla. 2013) (cites
omitted).

Plaintiff's argument for concealment is really the same as his argument on false oaths. In
particular, he points out the Debtor held title to the 2005 Honda Odyssey and did not schedule it.
The Court has already addressed this issue above and found the Debtor's failure to disclose the
Honda Odyssey was a false oath. Concealment, though, as used in Section 727 is generally more
than the failure to identify the property on the schedules. Usually, concealment under Section
727 involves transferring title to the debtor's property in anticipation of the bankruptcy or
financial difficulties while the debtor maintains all use and operation of it. The Honda Odyssey
was always in the Debtor's name and remained in the Debtor's name, so the Court declines to
find that the Debtor's failure to schedule it in Schedule B is the equivalent of concealment under
the facts of this case.

Plaintiff also argues the 2012 Toyota Camry is property of the Debtor that was concealed.
The Court disagrees. The 2012 Toyota Camry was never in the Debtor's name. Secondly, none
of the vehicles the Virani family owned prior to the purchase of the Honda Odyssey, the 2012
Toyota Camry and the 2009 Toyota Camry were owned by this Debtor. The vehicles were
previously owned by Mr. Virani, and one was owned by the Debtor's son. So while the change
in ownership of the vehicles from Mr. Virani to his wife and children may be evidence of
concealment by Mr. Virani, it is not evidence of concealment by the Debtor. Therefore, the
Court rules in favor of the Debtor with respect to Section 727(a)(2).

### III.    Books and Records – 11 U.S.C. § 727(a)(3)

Plaintiff argues the Debtor's discharge should be denied because she did not maintain adequate books and records.  To deny the Debtor a discharge under Section 727(a)(3), the Court must conclude

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3).

"The purpose of § 727(a)(3) is to give creditors, the trustee and the bankruptcy court complete and accurate information concerning the debtor's affairs and to ensure that dependable information is provided so that the debtor's financial history may be traced."  Hylan Debt Fund, LLC – Portfolio Series 18 v. Nestor (In re Nestor), 546 B.R. 482, 486 (Bankr. N.D. Ga. 2016) (citing Harrington v. Simmons (In re Simmons), 525 B.R. 543, 547 (B.A.P. 1st Cir. 2015)); In re Juzwiak, 89 F.3d 424, 427-28 (7th Cir. 1996) (cite omitted).  The debtor's intent is not an element of a denial of discharge under Section 727(a)(3).  Trauner v. Burrowes (In re Burrowes), 2011 WL 5035975, at *2 (Bankr. N.D. Ga. Oct. 13, 2011).  But the requirement under Section 727(a)(3) that a debtor maintain recorded information from which debtor's financial condition or business transactions might be ascertained is not absolute.  A debtor may receive a discharge if the failure to keep records is "justified under all the circumstances."  Milam v. Wilson (In re Wilson), 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983).

In particular, Plaintiff urges the Court to deny the Debtor a discharge because SHM did not maintain books and records sufficient to verify that Mr. Virani only received an average of $1,800.00 per month in income from SHM.  But Section 727(a)(3) is aimed at a debtor's actions. See Judgement Factors, L.L.C. v. Packer (In re Packer), 816 F.3d 87, 94 (5th Cir. 2016).  No

evidence was presented that the Debtor had concealed, destroyed or failed to keep SHM records. By the petition date, the company was owned by Mr. Virani and by all accounts he was in control of the operations. While the Debtor had owned the company in 2013 and held a managerial position in 2013, no evidence demonstrated the Debtor was ever responsible for the operation of the business or for maintaining its books and records. Thus, the Court cannot conclude the Debtor has failed to keep adequate records of her assets or of SHM.

## IV.    Failure to Satisfactorily Explain Any Loss of Assets – 11 U.S.C. § 727(a)(5)

Plaintiff pled Section 727(a)(5) as a basis for denying the Debtor a discharge, but little attention was paid to this particular section. The Court may deny the Debtor a discharge under Section 727(a)(5) if

> the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5).

In an action under 11 U.S.C. § 727(a)(5), the objecting creditor has the initial burden of proof and must demonstrate: "(1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets." Olympic Coast Inv., Inc. v. Wright (In re Wright), 364 B.R. 51, 79 (Bankr. D. Mont. 2007); Hawley v. Cement Ind., Inc. (In re Hawley), 51 F.3d 246, 249 (11th Cir. 1995). "A focus on the two years prior to the bankruptcy filing is common … [but] [i]nquiries beyond the two-year period may be warranted." Structured Asset Servs., L.L.C. v. Self (In re Self), 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005) (cites omitted). Once the party objecting to the discharge establishes the basis for its

objection, the burden then shifts to the debtor "to explain satisfactorily the loss." Chalik, 748 F.2d at 619. But the "lost" assets must be estate assets.

"The question of whether a debtor satisfactorily explains a loss of assets is a question of fact." Id. (citing Shapiro & Ornish v. Holliday, 37 F.2d, 407, 407 (5th Cir. 1935)). For an explanation to be unsatisfactory, the court does not have to find that a debtor is lying. In re D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996). Under Section 727(a)(5), "[v]ague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." Chalik, 748 F.2d at 619. "To be satisfactory, an explanation must convince the judge." Id. (cite omitted); see e.g., First Texas Savings Ass'n, Inc. v. Reed (In re Reed), 700 F.2d 986, 993 (5th Cir. 1983) (cites omitted) (debtor's explanation that $19,586.00 was consumed by business and household expenses and gambling debts was unsatisfactory). "Courts are not concerned with the wisdom of a debtor's disposition of assets but, instead, focus on the truth, detail, and completeness of the debtor's explanation of the loss." Self, 325 B.R. at 250 (cites omitted). "Section 727(a)(5) requires that there be a satisfactory explanation of the loss of an asset, but does not require that the explanation be meritorious. … The court need only decide whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper". Great American Ins. Co. v. Nye (In re Nye), 64 B.R. 759, 762 (Bankr. E.D. N.C. 1986); Bailey v. Whitehead (In re Whitehead) 483 B.R. 902, 910 (Bankr. E.D. Ark. 2012).

Plaintiff contends the Debtor disposed of cars and her portion of the 2014 tax refund without adequate explanation. Evidence was presented of the Debtor's husband having previously owned cars and surrendered them, but this is the Debtor's case and not her husband's case. As discussed previously, the Debtor and her husband stated that the 2014 tax refund was used to pay Mills & Hoopes, for school supplies for her children, and to pay an accountant.

While all of these expenses are not documented, the Court finds that the Debtor's and her husband's explanation as to her portion of the tax refund is satisfactory.

**V.       Refusal to Comply with an Order – 11 U.S.C § 727(a)(6)**

Finally, Plaintiff contends the Debtor's discharge should be denied because she failed to fully comply with various orders of the Court related to the production of documents.  Section 727(a)(6)(A) provides that the Debtor is not entitled to a discharge if she "has refused, in the case – (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify."  Plaintiff must prove that there has been a violation of a lawful order of the court. In re Jordan, 521 F.3d 430, 433 (4th Cir. 2008).  Once Plaintiff has demonstrated its case, the burden shifts to the debtor to prove that she has not committed the objectionable act or that there is some other defense.  Connelly v. Michael, 424 F.2d 387, 389 (5th Cir. 1970).  The term "refuse" is not defined in the Bankruptcy Code.  Marcus v. Jeffries (In re Jeffries), 356 B.R. 661, 667 (Bankr. E.D. Va. 2006).  However, the majority of courts have found that the term requires a showing of willful or intentional conduct, rather than simply mistake or inability to comply.  See Jordan v. Smith, 356 B.R. 656, 659-60 (E.D. Va. 2006); aff'd in part, rev'd in part sub nom; In re Jordan, 521 F.3d 430 (4th Cir. 2008) (collecting cases).  To satisfy his or her burden under Section 727(a)(6), the objecting party must demonstrate the debtor received the order in question and failed to comply with its terms.  See Katz v. Araujo (In re Araujo), 292 B.R. 19, 24 (Bankr. D. Conn. 2003).  Once done, the debtor is obligated to explain his or her failure to comply with the court order.  Assocs. Commercial Corp. v. Reavis (In re Reavis), 92 B.R. 380, 383 (Bankr. W.D. Mo. 1988).

Courts have held that "[f]ailure to timely produce discovery in an orderly, coherent fashion violates § 727(a)(6)(A) and may result in the denial of a debtor's discharge"; however, "such failure to produce must be willful and not merely inadvertent."  Law Offices of Dominic J.

Salfi, P.A. v. Prevatt (In re Prevatt), 261 B.R. 54, 60-61 (Bankr. M.D. Fla. 2000); see also In re Burrowes, 2011 WL 5035975, at *3 (mere failure to produce documents in response to order compelling production not equivalent to refusal under Section 727(a)(6)).

A denial of discharge should not be the primary remedy for discovery abuses.  Instead, Fed. R. Bankr. P. 7037 provides for remedies in the event a party fails to participate in discovery or comply with a discovery order.  The Court entered an order sanctioning the Debtor and her husband for failure to comply with certain discovery orders.  Moreover, Section 727(a)(6) only applies when a debtor refuses to comply with the order, not simply fails to comply.  Plaintiff is particularly irritated at the fact he had to subpoena documents from third parties rather than being provided documents by the Debtor.  Many if not all of those documents were not in the Debtor's possession, however.  When a document is not in the debtor's possession and can be as easily obtained by Plaintiff as by the defendant, the insistence on Plaintiff obtaining the documents independently does not equate to a refusal to comply with a court order.  Plaintiff's complaint under Section 727(a)(6) fails.

**VI.    Plaintiff's Miscellaneous Arguments**

In Plaintiff's written closing statement, he raises a number of other arguments the Court finds are not relevant to the Section 727 claim at issue.  Plaintiff makes several arguments as to why the Defendant's attorney, Evan Altman, should be sanctioned.  The Court notes Plaintiff has filed numerous motions to have Mr. Altman sanctioned and the Court has stated previously that all such motions will be heard after the entry of this Order.  Next, Plaintiff argues a trustee should pursue a number of preferences in this bankruptcy case.  This is not a preference case, however, but Plaintiff's complaint to deny the Debtor a discharge.  Whether preference actions are pursued is up to the judgment of the trustee.  Plaintiff further argues the Debtor should not be entitled to certain exemptions, particularly of the tax refunds, because the refund was not

identified initially nor was the exemption initially taken.  The Court notes this action is not a hearing on any objection to exemptions.  Plaintiff's objection to any exemptions of the Debtor will be dealt with separately following entry of this Order.  Finally, this Court ruled in the Section 707 Order that Plaintiff had not established a basis for dismissal of the bankruptcy case under Section 707(a) or (b) of the Bankruptcy Code.  Plaintiff continues to make many of the same arguments as to why the bankruptcy case should be dismissed.  He argues the case was a bad faith filing, that it was filed to avoid paying him, that different standards for dismissal should have been applied, and more.  No need exists for further hearings on whether the bankruptcy case should be dismissed because, since the Debtor's discharge is denied, dismissal of the bankruptcy case adds nothing.

## CONCLUSION

Plaintiff's allegations that the Debtor's discharge should be denied under Section 727(a)(2), (a)(3), (a)(5) and (a)(6) were not established by the evidence.  It is undisputed, however, that the Debtor made numerous false statements and omissions in her Schedules and Statement of Financial Affairs.  Given the number of mistakes, the obvious nature of many of the mistakes, and the Debtor's and her husband's history of making misrepresentations, the Court concludes the Debtor's omissions and misstatements were made with a reckless indifference to the truth sufficient to constitute the requisite fraudulent intent for denying her a discharge under Section 727.  Debtor's discharge is denied under 11 U.S.C. § 727(a)(4).

As the Debtor's discharge is denied in total, the portion of the complaint alleging Plaintiff's claim is non-dischargeable under Section 523 is moot, and is denied as such.

### ### END OF ORDER ###

## DISTRIBUTION LIST

Shehnaz Ali Virani
2030 Atkinson Park Drive
Lawrenceville, GA 30043

Evan M. Altman
8325 Dunwoody Pl, Bldg 2
Atlanta, GA 30350-3307

Dale R. F. Goodman
Chapter 7 Trustee
1303 Hightower Tr, Ste 200
Atlanta, GA 30350-2919

Mr. Girish Modi
3224 River Mist Cove
Decatur, GA 30034